**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

_____
                                        )
STEVEN C. LOVERN,                       )
        Plaintiff,                      )
                                        )
v.                                      )       **CIVIL ACTION**
                                        )       **NO. 09-40098-TSH**
MICHAEL J. ASTRUE, as Commissioner of   )
Social Security Administration,         )
        Defendant.                      )
_____)


**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR AN ORDER
AFFIRMING THE DECISION OF THE COMMISSIONER (Docket No. 16)
September 29, 2011**

**HILLMAN, M.J.**


**Nature of the Case**

Plaintiff Steven C. Lovern ("Lovern" or "Plaintiff") has brought this action against the Defendant, Michael J. Astrue, as Commissioner of Social Security Administration ("Commissioner") seeking judicial review of a final decision by the Commissioner denying his application for Social Security Disability Insurance benefits ("DBI") and Supplemental Security Income benefits ("SSI"); the Commissioner denied Lovern's application on the grounds that his impairments do not render him disabled. Lovern argues that Commissioner's decision is not based upon substantial evidence and, therefore, should be reversed and/or remanded for further proceedings. The Commissioner has file filed a motion for an order affirming the decision.[1]

---

[1] A copy of the Administrative Transcript ("*Tr.*")(Docket No. 13) has been provided to the Court under seal.

## Procedural History

Lovern filed applications for DBI and SSI on May 20, 2005 alleging that the he had been disabled since March 22, 2005 due to problems stemming from depression and anxiety. (*Tr.* 21, 58-62). Lovern's claim was initially denied on October 2, 2005 on the grounds that he was not disabled under the rules of the Social Security Administration ("SSA") . (*Id.*, at 349).

On October 24, 2005, Lovern filed a request for reconsideration, which was denied on January 11, 2006. (*Id.*, at 40-43). In its denial, the SSA determined that while Lovern was unable to work at that time (due to various mental health issues), his condition was expected to improve and would not prevent him from working for twelve months. (*Id.*, at 41). Lovern then requested a hearing before an Administrative Law Judge ("ALJ") (*Id.,* at 44); the hearing was held on December 15, 2006. (*See generally Id.*, at 400-452).

On June 22, 2007, the ALJ issued an unfavorable decision . (*Id.*, at 18-35). On July 3, 2007, Lovern filed a Notice of Appeal and Request for Review of the ALJ's decision. (*Id.*, at 395). On March 18, 2009, the Appeals Council denied Lovern's request for review, (*Id*. at 6-9) making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981 (2008). Lovern has exhausted his available administrative remedies, and the case is now ripe for review under 42 U.S.C. § 405(g).

## Facts

### *General Background, Education and Occupational History*

Lovern was born in 1968 and was 36 years old at the onset of his alleged disability, which Lovern claims was March 22, 2005; he was 38 years old at the time of the hearing before the ALJ. (*Tr.*, at 58, 404). He has a ninth grade education. (*Id.*, at 404). His previous work history includes positions as a plate technician for four years and delivery driver for ten years.

(*Id.,* at 405, 410). Both of these positions required lifting items weighing over 100 pounds. (*Id.*, at 408-10).

### *Mental Health History*

Lovern began receiving treatment for alcohol and cannabis dependence from Cathy Coughlin, LICSW, MSW, beginning on May 12, 2004. (*Id.*, at 122-27). Between 2004 and early 2006, Lovern received Global Assessment of Functioning ("GAF")[2] scores predominantly between 43 and 60. (*Id.*, at 160, 168, 186, 193, 206, 209, 286). During this time period, which followed his father's death and mother's cancer diagnosis, Lovern was enrolled in a detoxification program[3] and later a partial hospitalization program. (*Id.*, at 155, 168, 186, 199, 207, 213-226). From mid-2006 through early 2008, Lovern received GAF scores between 52 and 65. (*Id.*, at 291, 298, 308, 319, 324, 369, 376).

During 2005 and 2006, several mental health professionals completed Psychiatric Review Technique Forms ("PRTF") assessing Lovern's potential mental impairments during this period. (*Id.*, at 170, 227, 243, 325, 336). J. Whitehorn, Ph.D completed a PRTF covering the period from March 2005 through September 27, 2005. (*Id.,* at 170-84). Dr. Whitehorn found that Lovern suffered from affective disorders, anxiety related disorders and substance addiction

---

[2] "The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning and refers to the level of functioning at the time of evaluations." *Bernier v. Astrue*, C.A. No. 09-12167-DJC, 2011 WL 1832516 (D.Mass. May 13, 2011). GAF scores can range from 0-100. GAF scores between 41 and 50 indicate serious symptoms, that is "serious impairment in social, occupational, or school functioning," scores between 51 and 60 indicate moderate symptoms, and scores between 61 and 70 indicate mild symptoms. *See* American Psychiatrists Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., 2000).

[3] On March 31, 2005, Lovern was admitted into the Community HealthLink Detox program. (*Tr.,* at 158). The next day, he discharged himself from the program against medical advice. (*Id.,* at 157, 168). Shortly thereafter, Lovern began intensive outpatient treatment at the Beacon Program/Franklin Medical Center and ultimately entered Franklin Medical Center's partial hospitalization program; Lovern left the partial hospitalization program after one day. (*Id.*, at 186-88, 191, 193, 199, 209).

3

disorders; Dr. Whitehorn concluded that Lovern's impairments were not severe. *(Id.,* at 170*).* Dr. Whitehorn further found that Lovern had the following degree of functional limitations: (i) mild limitation of daily living activities; (ii) mild difficulties in maintaining social functioning; and (iii) mild difficulties in maintaining concentration, persistence or pace. Dr. Whitehorn found that Lovern had no episodes of decompensation. (*Id.*, at 180).

On December 16, 2005, Ms. Coughlin completed a PRTF. (*Id*., at 227-35). She concluded that Lovern equaled or met listings 12.04 (affective disorder) and 12.06 (anxiety related disorder). Ms. Coughlin further found that Lovern had the following degree of functional limitations: (i) marked limitation of daily living activities; (ii) marked difficulties in maintaining social functioning; (iii) constant difficulties in maintaining concentration, persistence or pace; and (iv) repeated (three or more) episodes of deterioration or decompensation in work or work like settings. (*Id.*, at 234).

On January 3, 2006, P. Robbins, Ed.D completed a PRTF. (Tr. 243-55). Dr. Robbins concluded that Lovern had severe mental impairments that were not expected to last twelve months. (*Id.*, at 243). Dr. Robbins further found that Lovern had the following degree of functional limitations: (i) moderate limitation of daily living activities; (ii) marked difficulties in maintaining social functioning; (iii) marked difficulties in maintaining concentration, persistence or pace; and (iv) no repeated episodes of deterioration or decompensation in work or work like settings. (*Id.*, at 253). Dr. Robbins completed an RAF capacity assessment that same date , which appears to contain contradictory findings (*Id.*, at 236-38); specifically, Dr. Robbins indicates that Lovern *would* be able to sustain adequate pace, persistence, and concentration for simple tasks. (*Id.*, at 238).

4

On November 28, 2006, John Talbot, RN, MSN completed a PRTF. (*Id.,* 336-44). Mr. Talbot concluded that Lovern met or equaled listings 12.04 (affective disorders), 12.06 (anxiety disorders) and 12.09 (substance addiction disorders). (*Id.* at 336, 338). Mr. Talbot's conclusions as to Lovern's functional limitations are confusing-- he made multiple findings with respect to each category (he checked off or made an "x" in multiple boxes) and it is unclear whether he intended the "initialed" or "un-initialed" marked boxes to reflect his ultimate findings. (*Id.*, 343).[4]

Finally, on December 12, 2006, Ms. Coughlin completed a second PRTF. (*Id.*, at 325-33). She again concluded that Lovern equaled or met listings 12.04 and 12.06 and 12.09. *(Id.,* at 325). She also concluded that he had the following functional limitations: (i) moderate limitation of daily living activities; (ii) marked difficulties in maintaining social functioning; (iii) constant difficulties in maintaining concentration, persistence or pace; and (iv) continual episodes of deterioration or decompensation in work or work like settings. (*Id.*, at 234).

### *Medical History*

Lovern cited back problems as a factor contributing to his alleged disability. At the hearing before the ALJ, Lovern testified that he suffered constant back pain. (*Id.*, at 428). Lovern's 2008 medical records indicate that he had complained of experiencing of lower back pain, upper thoracic pain, and parascapular pain for the prior four years. (*Id.*, at 387-89). However, on October 28, 2005, Lovern noted in an intake form for a partial hospitalization program that he had no chronic, persistent, or current pain; the intake nurse noted that Lovern

---

[4] There are four functional limitation categories: (1) restrictions of activities of daily living; (2) difficulties maintaining social functioning; (3) deficiencies of concentration, persistence or pace; and (4) episodes of deterioration or decompensation in work or work-like settings. For each category, the examiner can choose one of the following by marking a box: "None," "Slight," "Moderate," "Marked," "Extreme," or "Insufficient Evidence."

described his pain as related to occasional back spasms for which the treatment he was receiving (flexeril) was effective. (*Id.*, at 203).

Lovern underwent a series of X-ray and MRI exams. (*Id.*, at 264, 306, 307). A December 20, 2005 X-ray of sacroiliac joints and his lumbar and thoracic spine indicated degenerative changes at the L2-L3 level. (*Id.,* at 264). A December 24, 2005 image of the cervical spine showed mild degenerative changes at C6-C7 level. (*Id.* at 265). A February 5, 2006 MRI of Lovern's cervical spine showed potentially significant bilateral discase with right C7-T1 slightly more prominent than left C6-7. (*Id.*, at 306). An April 13, 2006 MRI of Lovern's thoracic spine was unremarkable. (*Id.,* at 307).

Lovern testified that due to his back pain his daily activities were limited. He is only able to lift 10 to 15 pounds, load the dishwasher, and carry light groceries. (*Id.*, at 441). Additionally, he testified that he has dizzy spells two to three times a week, which often require him to sit down for one to two hours. (*Id.*, at 414-15).

*ALJ's and Board's Findings*

The ALJ denied Lovern's application for DBI and SSI. (*See generally Tr.,* 18-35). In so doing, the ALJ conducted the five-step analysis outlined in 20 C.F.R. § 404.1520 to determine whether Lovern is disabled. After evaluating the evidence, the ALJ concluded that Lovern is not disabled and is not eligible to collect DBI and SSI. Among the findings which the ALJ made in making this determination are the following:

(1) Lovern met the insured status requirements of the Act through December 31, 2010 (*Id.,* at 23);

(2) Lovern has not engaged in substantial gainful activity since March 22, 2005 (his alleged onset date) (*Id..*);

(3) Lovern has the following severe combination of impairments: neck and back pain, depression, anxiety, and polysubstance abuse through May 2006 (*Id.*);

(4) Lovern does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments (*Id.*);

(5) Lovern has the residual functional capacity to perform work at the light exertional level and is capable of understanding and remembering simple instructions, concentrating on simple tasks for a 2 hour period over an 8 hour day, interacting appropriately with co-workers and supervisors, and adapting to changes in a work setting (*Id.,* at 24);

(6) Lovern is unable to perform any past relevant work. (*Id.*, at 27).

(7) Considering Lovern's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the he can perform (*Id.*, at 28); and

(8) Lovern has not been under a disability, as defined in the Act, from March 22, 2005 through the date of the ALJ's decision (*Id.*, at 29).

The Appeals Council found no reason under its rules to review the ALJ's decision. (*Tr.,* at 6). Therefore, Lovern's request for review was denied and the ALJ's decision became the final decision of the Commissioner. (*Id.*).

## **Standard of Review**

### *Affirmance or Reversal of Commissioner's Decision*

Under § 205(g) of the Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. *See* 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if it is supported by substantial evidence and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as

adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the court, to find facts, decide issues of credibility, draw inference from the record, and resolve conflicts in the evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal is warranted only if the ALJ committed a legal or factual error in evaluating the claim, or if the record contains no "evidence rationally adequate ... to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Social Security*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizzaro* v. *Sec'y of HHS.*, 76 F.3d 15, 16 (1st Cir. 1996).

*Standard for Entitlement to Disability Insurance Benefits*

In order to qualify for disability insurance benefits, a claimant must demonstrate that the he is disabled within the meaning of the Act. The Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment(s) must be severe enough to prevent the claimant from performing not only his past work, but any substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. *Id.* § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in [Appendix 1 of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
>
> These first three tests are "threshold" tests. If the claimant is working or has the physical or mental capacity to perform "basic work-related functions," he is automatically considered not disabled. If he has an Appendix 1-type impairment, he is automatically considered disabled. In either case, his claim is determined at the "threshold." If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no "Appendix 1" impairment (test 3), the SSA goes on to ask the fourth question:
>
> Fourth, does the claimant's impairments prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four steps of the analysis. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy. *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In making that determination, the ALJ must assess the claimant's

9

residual functional capacity ("RFC") in combination with vocational factors, including the claimant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

## Discussion

The Commissioner asserts that the decision denying Lovern DBI and SSI benefits should be affirmed because it is supported by substantial evidence. Lovern, on the other hand, argues that decision of the ALJ was not based upon substantial evidence and that he has established "good cause" to warrant remand of his claim for further proceedings or, in the alternative, a finding that he has been disabled since March 22, 2005.

### *Scope of the Issues Raised In Lovern's Appeal*

Lovern's submissions fail to include any developed argumentation in support of his claim. Instead, Lovern's brief recites relevant favorable facts from the record, and other than a few conclusory statements that certain of Lovern's alleged mental and physical disorders met the listing level of impairment under cited disability guidelines (thus requiring a finding of disabled), he does not cite any legal authority in support of his position. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). This is so because it is the parties burden, not the court, to develop arguments in support of their claims/positions, with citation to relevant legal authority. *Shaner v. Chase Bank USA*, 587 F.3d 488 (1st Cir. 2009) (citing *Yeomalakis v. F.D.I.C.*, 562 F.3d 56, 61 (1st Cir. 2009) ("It is not our job, especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief.")); *Zannino*, 895 F.2d at 17 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.")

At the same time, Lovern has cited to medical evidence in the record and while he has failed, for the most part, to challenge the ALJ's findings with respect to the five-step sequential evaluation process, his submissions make clear that he is focused on challenging the ALJ's ultimate determinations that he is not disabled and that he is able to perform jobs that exist in significant numbers in the economy. In support of this contention, Lovern argues only that the ALJ erred by ignoring specified aspects of the vocational expert's testimony and doing so was an error of law and fact. Bearing in mind the limited issue raised by Lovern, the Court will now address whether the Commissioner's decision should be affirmed.

### *Whether The ALJ Erred*

Before addressing the specifics of Lovern's claim, I will note that in making his determination that Lovern was not disabled, the ALJ undertook the required five-step procedure set forth in 20 C.F.R. §404.1520(a)(4); plaintiff does not contend otherwise. At step five, Lovern utilized the assistance of a vocational expert, Amy Vercillo ("VE"). The VE was aware of Lovern's past work experience as a plate technician and medical equipment deliverer; she characterized those occupations as heavy skilled, and heavy and semi-skilled respectively. (*Tr.,* at 443). The ALJ asked the VE to assume the following facts:

- A thirty-eight year old male with ninth grade education, having Lovern's work history and capable of performing work at the light exertional level.

- The individual can understand and remember simple instructions and can concentrate for two hour periods on simple tasks.

- The individual can interact appropriately with co-workers and supervisors, and adapt to changes in the work setting.

(*Tr.,* at 444). The VE testified that the individual would not be able to perform Lovern's past relevant work because it would be beyond the individual's exertional ability. (*Id.*). The VE

11

further testified that there are job in the national or regional economy that such an individual could perform: sedentary and light, unskilled occupations, including bench assembler and assembly machine tender. (*Id.*).

The ALJ then asked the VE to assume the following facts:

- The same age, education and work history as the prior individual.

- The individual can lift 10 to 15 pounds (up to 15 pounds).

- The individual can stand or walk a total of two hours over an eight hour period with less than occasional stooping.

- The individual would require unscheduled breaks that could total two hours over an eight hour period.

- The individual would have marked or serious limitation in the ability to maintain concentration, persistence or pace.

(*Id.*, at 445).

The VE testified that this individual could not perform Lovern's past relevant work. The VE further testified that due to the unscheduled work break limitation and the marked or severe restrictions in concentration, there would be no jobs available for such individual in the marketplace. (*Id.*).[5]

---

5 Lovern's counsel asked the VE to consider a third hypothetical situation involving the following facts:

- The individual has the same work history and educational background as Lovern.

- The individual requires assistance on a regular basis to read or comprehend simple written materials and instructions.

- The individual has a history of polysubstance abuse, but is currently in remission.

- The individual has been diagnosed with chronic moderate to severe depression, anxiety, and deficiencies in persistence or pace and ability to concentrate resulting in failure to complete tasks in a timely manner.

- The individual's diagnosis results in constant episodes of deterioration or decompensation in work or work like settings which cause the individual to withdraw from that situation or to experience an exacerbation of the signs and symptoms which may include a deterioration of his ability to adapt to changing situations.

Thus, at the hearing, the ALJ presented the VE with two hypothetical regarding whether jobs exist in the national economy for a person with the same age, education, and work history as Lovern with the two hypotheticals imposing a differing set of limitations on the person. The difference between the two hypotheticals is that in the second, the individual would on occasion be required to take unscheduled breaks of two hours and would have marked or serious limitation in the ability to maintain concentration, persistence or pace. Lovern contends that because in his decision the ALJ relied upon the first hypothetical question and not the second, his conclusion is not supported by substantial evidence.

The ALJ expressly found that Lovern has the RFC to perform work at the light exertional level and was capable of understanding and remembering simple instructions, concentrating for a two hour period over an eight hour day on simple tasks, could interact appropriately with co-workers ans supervisors and could adopt to changes in a work setting. (*Id*., at 24). In so finding, the ALJ determined that "[Lovern's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, *but* that [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible". (*Id.*, at 26)(emphasis added). The ALJ cited to the following medical evidence in support of his conclusion:

---

(*Id.*, at 449). The VE testified that such an individual could not perform Lovern's past work or any other work in the labor market. (*Id.*). Lovern does not argue that the ALJ erred by not basing his decision on an individual who meets the criteria of this third hypothetical.

13

- With respect to Lovern's neck and back problems, the ALJ cited records from Dr. Matthews and others from December 24, 2005 through April 13, 2006, including x-rays and MRIs of Lovern's spine with results ranged from mild degenerative disease with mild disc space narrowing to unremarkable, as well as a February 5, 2006 MRI of the cervical spine which showed bilateral disease with one aspect that *may* be significant. The ALJ concluded that the medical evidence did not support Lovern's subjective complaints. Furthermore, the ALJ pointed out that there is essentially nothing in the medical record which supports a finding that any medical personnel have imposed limitations on Lovern due to any physical impairments. Nevertheless, giving Lovern the benefit of the doubt, the ALJ determined that he was limited to a light exertional level of work. The ALJ also found that the medical records did not support Lovern's subjective testimony that he had to lie down for two hours at a time due to dizziness.

- With respect to Lovern's mental health problems, the ALJ cited to the records of Cathy Coughlin, MSW, LICSW, John Talbot, RN, MSN Clinical Nurse specialist and Dr. Robbins. The ALJ did not give much weight to Dr. Whitehorn's findings, as Dr. Whitehorn did not have all the medical treatment records before him. Dr. Whitehorn found that for the period from March 2005 through September 2005, Lovern suffered from various mental disorders, but that they were not sever. He further found that Lovern had only mild functional limitations, including mild difficulties in maintaining concentration, persistence or pace. The ALJ acknowledged that Ms. Coughlin had assessed that Lovern had marked limitations in 2005 and that Dr. Robbins also found that Lovern at times had marked limitations in 2006. However, Dr. Robbins's assessment concluded that Lovern's limitations would not last twelve months and the ALJ gave weight to this finding. The ALJ gave little weight to Ms. Coughlin's and Mr. Talbot's assessments later in 2006 which found that Lovern had marked limitations and met a Listing. The ALJ explained that he gave little weight to these assessments because they are not supported by any treatment record, and further, after Dr. Robbins's assessment, Lovern relapsed, that is, he had used illegal narcotics (marijuana and cocaine) and drank alcohol. Regarding Lovern's depression, anxiety and substance abuse, the ALJ found that Lovern is capable of remaining sober and that when he does so, his symptoms are abated.

- The ALJ gave weight to state agency medical consultant's assessment of Lovern's RFC which determined that he has moderate limitations in some areas of functioning.

- Finally, the ALJ found that the record evidence supported a finding that Lovern's symptoms had been relatively stable and that they were being controlled by prescribed medications and therapy.

Based on the above findings, the ALJ concluded that Lovern had the following severe impairments: neck pain, back pain, depression, anxiety, polysubstance abuse, but that such

14

impairments do not meet or equal a Listing and have at no time met a Listing for twelve continuous months.

Answers to hypothetical questions by a vocational expert constitute relevant evidence if the premises are supported by substantial evidence in the record. *Garay v. Sec'y of Health & Human Servs.*, No. 94-1515, 1995 WL 54077, at *1 (1st Cir. Feb. 10, 1995) (per curiam) (unpublished). "When presenting a hypothetical to a vocational expert, the question 'must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant'". *Aho v. Comm'r of Soc. Sec.,* No. 10-40052-FDS, 2011 WL 3511518, *7 (D.Mass. Aug. 10, 2011)(citation to quoted case omitted). In order for a vocational expert's answer to a hypothetical question to be relevant, the ALJ must accurately transmit the relevant premises supported by medical authorities in the form of the assumptions. *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion." *Rodriguez*, 647 F.2d at 222. It is the province of the ALJ to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts in the evidence. *Irlanda*, 955 F.2d at 769. Substantial evidence may exist "even if the record could arguably justify a different conclusion." *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987).

The first hypothetical posed by the ALJ assumes an individual who is capable of performing work at the light exertional level, could understand and remember simple instructions, could concentrate for two hour periods on simple tasks, could interact appropriately with co-workers and supervisors, and could adapt to changes in the work setting. The assumptions behind the second hypothetical included more limitations, including the need for unscheduled breaks and

15

marked or severe limitations in maintaining concentration, persistence, or pace. As noted above, the ALJ expressly found, however, that there was no medical evidence to support a finding that Lovern needed unscheduled breaks, and he rejected the medical evidence that Lovern had marked or severe limitations in maintaining concentration, persistence or pace. Assuming that these findings are supportable, it would have been error for the ALJ to rely on the second hypothetical. The question thus becomes whether the record supports the ALJ's determination that the medical records do not support a finding that Lovern would be subject to unscheduled breaks and suffered marked or severe limitations in maintaining concentration, persistence or pace.

As to whether the record established that Lovern would be required to take unscheduled breaks of two or more hours during an eight hour work day, I agree with the ALJ that the record is totally devoid of any evidence to support such a limitation. That is, there is nothing in the medical evidence which suggests that Lovern suffers from dizzy spells and is required to sit for a few hours until such spells abate. Therefore, the only evidence in the record concerning such alleged condition is Lovern's testimony at the hearing.

In addressing a subjective complaint such as this, the ALJ must first establish if the plaintiff meets the threshold requirement of suffering from an underlying medical impairment that could reasonably be expected to cause the pain or symptom alleged. *See* Social Security Ruling 96-7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements,* 1996 WL 374186 (S.S.A. Jul. 2, 1996). If an individual's statements are not substantiated by the objective medical evidence, then the ALJ must consider all of the record, including both the individual's statements and any third party statements regarding his symptoms, and make a finding on the credibility of the individual's statements about his

symptoms and their functional effects. *Id.* Simply put, although the ALJ must consider a claimant's subjective allegations of his symptoms and functional limitations, he is not required to accept them at face value and may reject them where they are not supported by the evidence in the record, including the medical evidence, treatment history and daily living activities.

In dismissing Lovern's testimony concerning intermittent episodes of dizziness, the ALJ first noted that Lovern's medically determinable impairments could reasonably be expected to produce the alleged symptoms. Furthermore, Lovern suggested that the dizziness could be a side effect of one of his medications, but the medical records do not reflect that Lovern ever complained about dizzy spells to any of the medical professionals or counselors, which he saw with some frequency. Therefore, as to this issue, I find that the credibility determination by the ALJ, who observed Lovern, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference. *See DaRosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir.1986).

The ALJ determined that Lovern did not have marked or severe limitations in maintaining concentration, persistence, or pace. A diagnosis by a treating counselor is not necessarily given more weight than other diagnoses. *See Sitar v. Schweiker*, 671 F.2d 19, 22 (1st Cir. 1982). Further, it is the role of the ALJ to resolve any evidentiary conflicts. *Irlanda Ortiz*, 955 F.2d at 769. After the onset of his disability, Lovern underwent five PRTFs, including two by his treating counselor, Ms. Coughlin. The ALJ gave most weight to the PRTF by Dr. Robbins that reported marked limitations but did not expect the severity to last more than 12 months. As Lovern points out, this determination conflicts with the findings of Ms. Coughlin, the Plaintiff's treating counselor and John Talbot, RN, which indicated marked limitations in concentration,

17

persistence or pace[6]. As the ALJ noted, however, other evidence in the record demonstrates that Lovern had been struggling with the death of his father, his mother's cancer diagnosis, substance abuse relapses, and marital problems throughout the time that he was seeing Ms. Coughlin. Her case notes suggest that when Lovern remains sober and things are going well, his symptoms abate significantly. (*Tr.,* at 255). Yet Ms. Coughlin's assessments do not reflect or conflict with such findings. Additionally, although the ALJ gave his opinion less weight, Dr. Whitehorn also concluded that for the six month period of March- September 2005), Lovern had no serious impairments and only mild functional limitations. The ALJ also considered that Lovern's GAF scores increased from the severe impairment to the moderate impairment range during the relevant period.

The ALJ is charged with weighing conflicting evidence and does not necessarily need to give more weight to the opinion to a treating professional. *Irlanda Ortiz*, 955 F.2d at 769; *See Sitar*, 671 F.2d at 22. The ALJ did not baselessly reject the opinions of the treating counselor and nurse, but rather weighed conflicting medical assessments in the light of the rest of the record in making his conclusion. Therefore, it was not error for the ALJ to give more weight to Dr. Robbins's opinion.[7] Furthermore, given the ALJ's findings of fact, it was appropriate for him to

---

[6]As noted previously, Talbot's assessment is ambiguous. However, for purposes of this decision, I will assume that in his evaluation, he determined that Lovern had constant deficiencies in concentration, persistence and pace. (*Tr.,* at 343). I will make two observations concerning this conclusion. First, Talbot based much of his assessment on Lovern's self reporting of his symptoms and functional limitations. However, some of the information which Lovern provided to Talbot concerning his use of alcohol and cocaine is inconsistent with other evidence in the record. *See* (*Tr.,* at 323)(Lovern reports to Talbot in November 2006 that he last used cocaine in his twenties and that he had not had any alcohol in about a year) and (*Tr.,* at 293)(Lovern reports primary drug use is cocaine, which he last used May 2006 and last drank alcohol in May 2006). Second, Talbot's assessment conflicts with some of the notations he made in his case notes concerning Lovern's ability to concentrate.

[7] Lovern suggests that medical evidence which he submitted after the hearing supports a remand. However, the medical evidence continues to be conflicting regarding the severity of Lovern's impairments while, at the same time, making clear he continues to suffer relapses with respect to using alcohol and drugs.

18

rely on the VE's response to the first hypothetical. Indeed, it would have been error for the ALJ to rely on the second hypothetical which he found included facts which were not supported by the record. Therefore, the ALJ's decision denying Lovern DBI and SSI is affirmed.

## **Conclusion**

For the foregoing reasons, the Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket No. 16) is ***granted***.

**So Ordered.**

                                      **/s/ Timothy S. Hillman**
                                      TIMOTHY S. HILLMAN
                                       MAGISTRATE JUDGE